Karie J. Boyd, Esq. / SBN 256840
Thomas D. Georgianna, Esq. / SBN 242115
BOYD LAW, APC
2029 Century Park East, Suite 2880
Los Angeles, CA 90067
Telephone: (310) 777-0231
Facsimile: (310) 694-0733

Attorneys for Plaintiff, John Hackert

FILED
CLERK, U.S. DISTRICT COURT
NOV 13 2014
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JOHN HACKERT, an individual,

Plaintiff,

v.

CHARLES BAND, an individual, d/b/a FULL MOON HOLDINGS, d/b/a FULL MOON HOLDINGS, INC., d/b/a FULL MOON FEATURES; FULL MOON HOLDINGS CORP., a California Corporation d/b/a FULL MOON FEATURES, d/b/a CALIFORNIA FULL MOON HOLDINGS, INC., d/b/a FULL MOON HOLDINGS, INC.; and DOES 1 through ~~20~~ 10, inclusive,

Defendants.

CASE NO. CV14-8814 FMO JPRx

**COMPLAINT FOR:**

1. **BREACH OF CONTRACT**
2. **MONEY HAD AND RECEIVED**
3. **FRAUD**
4. **CONVERSION**
5. **FRAUDULENT CONVEYANCE**

**JURY TRIAL DEMANDED [FRCP 38]**

## COMPLAINT

Plaintiff, by and through his undersigned attorneys, alleges as follows:

## I. INTRODUCTION

1. Plaintiff, John Hackert, became an acquaintance of Defendant Charles Band ("Band") at one of Band's fundraising roadshows.

2. Plaintiff loaned Band a small sum of money for the production of Band's movie, "Petrified," in September of 2006. Plaintiff then made five further loans to Band over the next five years for the production of seven more films.



ORIGINAL

3. On November 14, 2011, Plaintiff loaned Band and Defendant California Full Moon Holdings, Corp. ("FMH," collectively "Defendants") $50,000 for the production of "Zombies vs. Strippers." According to their contract, Defendants were to pay Plaintiff 50% of the film's net revenue until the principal amount was repaid, and then with 30% of the film's net revenue for 10 years. Furthermore, Band personally guaranteed the loan's principal value; Band promised to return Plaintiff's principal to him by December 17, 2012.

4. As of the present, Defendants repaid only $21,000 of Plaintiff's principal and none of the net revenue for this loan.

5. On May 3, 2012, Plaintiff loaned Band and FMH $200,000 for the production of "Puppet Master 10." According to their contract, Defendants were to pay Plaintiff 50% of the film's net revenue until the principal amount was repaid, and then with 50% of the film's net revenue for 10 years. Furthermore, Band personally guaranteed the loan's principal value; Band promised to return Plaintiff's principal to him by December 4, 2013.

6. As of the present, Defendants repaid neither Plaintiff's principal nor any of the net revenue for this loan.

7. On numerous occasions, Plaintiff requested accounting statements, production costs, and revenue statements for the two movies his loans financed, but neither Defendant responded. They have either ignored his request or provided excuses as to why they could not fulfill this request.

8. On numerous occasions, Plaintiff requested the return of his principal and the payment of money owed to him, but neither Defendant responded. They have either ignored his request or provided excuses as to why they could not fulfill this request.

9. On numerous occasions, Plaintiff requested that an accountant of his choice audit FMH's business records, as their contract allows. Defendants either ignored this request or provided excuses as to why they could not fulfill this request.

10. On June 20, 2013, Plaintiff received a note, apparently generated by Band on his own computer, purporting to show that Defendants were insolvent.

11. On July 29, 2013, Defendants promised to send Plaintiff a $2,000 check every

two weeks in order to begin paying back some of the amount owed. However, Defendants did not even keep up with this token amount, and stopped sending checks after the second installment.

12. As a result of Defendants' failure to provide the promised returns, failure to provide Plaintiff with any financial disclosure or the ability to appoint an impartial accountant, misrepresentations, omissions, intentional concealments, and refusal to return Plaintiff's $250,000 principal, Plaintiff has been defrauded by Defendants and others who either conspired with Defendants or aided and abetted Defendants' perpetration of the frauds.

## II. JURISDICTION AND VENUE

13. This Court has diversity jurisdiction based on the parties' diversity of citizenship.

14. Plaintiff alleges diversity jurisdiction under Title 15 U.S.C. § 1332 in that: Plaintiff is a U.S. citizen and a domiciliary of the state of New York; Band is a U.S. citizen and a domiciliary of the state of California; and FMH is a suspended California corporation with its principal place of business also in California.

15. Venue is also proper in the district under Title 28 U.S.C. §§ 1391(a) and (b). Among other things, many of the acts and much of the conduct constituting the unlawful acts alleged in this Complaint all occurred within the U.S. Central District of California, and through various means and instrumentalities of interstate commerce, including U.S. mails and wires.

16. Further, as alleged herein, Band resides in this district, and the claims stated in this Complaint either arose in or out of conduct occurring in or emanating from this judicial district, including dissemination of false and misleading information. Accordingly, venue is proper in the U.S. Central District of California.

## III. THE PARTIES

### A. Agency, Alter Ego, Conspiracy, Aiding and Abetting, and Doe Defendant Allegations

17. At all times, Band was the agent or employee of the other defendants, and in doing the things alleged, was acting within the course and scope of such agency or employment. And, in doing the acts alleged in this Complaint, Band was acting with the knowledge, consent,

permission, and authorization of the remaining defendants. All of the acts and omissions complained of in this Complaint were also ratified and approved by the other defendants.

18. At all times, each of the defendants was acting in concert with, or as joint ventures, or as co-conspirators with each of the remaining defendants, and each of them ratified, approved of, or endorsed the acts complained of in this Complaint.

19. Each of the defendants was also aware of the wrongful conduct alleged in this Complaint, and nonetheless aided and abetted each other to help each other accomplish the wrongs complained of in this Complaint.

20. Specifically:

1) Band directly controls the operations of FMH and its associated names and titles;

2) FMH is now and was at all times mentioned a mere shell, instrumentality, and conduit whose sole purpose was to allow Band to carry out his frauds on Plaintiff;

3) Band exercises such control and dominance over FMH that any individuality or separateness between FMH on the one hand and Band on the other does not exist and has never existed;

4) Adherence to the fiction of the separate existence of Band and FMH would, in this case, sanction fraud and promote injustice;

5) If the corporate entity FMH is not disregarded, Band could effectively be insulated from liability for his obligations and conduct, which would be unjust and inequitable.

21. The true names and capacities, whether individual, corporate, associate, or otherwise, of defendants fictitiously named as "Does 1 through 20, inclusive," are presently unknown to Plaintiff. Plaintiff will seek leave to amend this Complaint to allege the true names and capacities of Does 1 through 20, inclusive, when the true names and capacities of each "Doe" defendant have been ascertained.

22. Whenever this Complaint references any act, deed, or transaction of any

individual, corporation, limited liability company, or limited partnership, the allegation means that the individual, corporation, limited liability company, or limited partnership engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's, limited liability company's, or limited partnership's business or affairs.

23. Allegations regarding "Defendants" in this Complaint refer to both Band and FMH, unless specified otherwise.

**B. The Plaintiff**

24. Plaintiff is a U.S. citizen and a domiciliary of New York.

**C. The Defendants**

25. Band is a U.S. citizen and a domiciliary of California.

26. FMH is a California corporation whose principal place of business is also in California. FMH was incorporated on June 30, 2010, under the laws of the state of California, and suspended on January 2, 2013.

27. Band is the Chief Executive Officer of FMH.

28. The true names, capacities, and residency of defendants fictitiously named as "Does 1-20, inclusive" are presently unknown, and Plaintiff will amend this Complaint when each "Doe" defendant's name, capacity, and residency is ascertained.

## IV. FIRST CLAIM FOR RELIEF: FIRST BREACH OF CONTRACT AGAINST ALL DEFENDANTS

29. Plaintiff adopts by reference paragraphs 1-28 here.

30. Band induced Plaintiff to enter into a valid contract in the state of California on November 14, 2011. A true and accurate copy is attached here as **Exhibit 1**. Under the contract, Plaintiff was to loan Band and FMH $50,000 for the production of the film "Zombies vs. Strippers" in return for a percentage of the film's revenues. Furthermore, Band personally guaranteed Plaintiff's principal investment.

31. Plaintiff performed all of his conditions, covenants, and promises under the contract by loaning Defendants the required sum.

32. Defendants breached their duty under both the contract and the personal guarantee by failing and refusing to perform promises to pay Plaintiff the promised returns and to return Plaintiff's principal investment.

33. As a result of Defendants' breach, Plaintiff has been damaged in the amount of $50,000, plus promised returns, plus prejudgment interest, plus consequential and incidental damages to be proven at trial.

## V. SECOND CLAIM FOR RELIEF: SECOND BREACH OF CONTRACT AGAINST ALL DEFENDANTS

34. Plaintiff adopts by reference paragraphs 1-33 here.

35. Defendants induced Plaintiff to enter into a valid contract in the state of California on May 3, 2012. A true and accurate copy is attached here as **<u>Exhibit 2</u>**. Under the contract, Plaintiff was to loan Band and FMH $200,000 for the production of the film "Puppet Master 10" in return for a percentage of the film's revenues. Furthermore, Band personally guaranteed Plaintiff's principal investment.

36. Plaintiff performed all of his conditions, covenants, and promises under the contract by loaning Defendants the required sum.

37. Defendants breached their duty under both the contract and the personal guarantee by failing and refusing to perform their promises to pay Plaintiff the promised returns and to return Plaintiff's principal investment.

38. As a result of Defendants' breach, Plaintiff has been damaged in the amount of $200,000, plus promised returns, plus prejudgment interest, plus consequential and incidental damages to be proven at trial.

## VI. THIRD CLAIM FOR RELIEF: FIRST BREACH OF PERSONAL GUARANTEE AGAINST ALL DEFENDANTS

39. Plaintiff adopts by reference paragraphs 1-38 here.

40. Band personally guaranteed FMH's performance under the November 14, 2011 contract for $50,000. He promised to repay Plaintiff the full amount of his principal by December 17, 2012.

41. Plaintiff performed all of his conditions, covenants, and promises under the contract by loaning Defendants the required sum.

42. Band breached his duty under his personal guarantee by failing and refusing to perform his promises to pay back Plaintiff's principal investment by December 17, 2012.

43. As a result of Band's breach, Plaintiff has been damaged in the amount of $50,000, plus promised returns, plus prejudgment interest, plus consequential and incidental damages to be proven at trial.

## VII. FOURTH CLAIM FOR RELIEF: SECOND BREACH OF PERSONAL GUARANTEE AGAINST ALL DEFENDANTS

44. Plaintiff adopts by reference paragraphs 1-43 here.

45. Band personally guaranteed FMH's performance under the May 3, 2012 contract for $200,000. He promised to repay Plaintiff the full amount of his principal by December 4, 2013.

46. Plaintiff performed all of his conditions, covenants, and promises under the contract by loaning Defendants the required sum.

47. Band breached his duty under his personal guarantee by failing and refusing to perform his promise to pay back Plaintiff's principal investment by December 4, 2013.

48. As a result of Band's breach, Plaintiff has been damaged in the amount of $200,000, plus promised returns, plus prejudgment interest, plus consequential and incidental damages to be proven at trial.

## VIII. FIFTH CLAIM FOR RELIEF: FIRST MONEY HAD AND RECEIVED AGAINST ALL DEFENDANTS

49. Plaintiff adopts by reference paragraphs 1-48 here.

50. Band and FMH became indebted to Plaintiff for the sum of $50,000 on December 17, 2011, for money lent by Plaintiff to Defendants.

51. Band and FMH did not use Plaintiff's investment for Plaintiff's benefit. Instead of using Plaintiff's loan to generate returns for Plaintiff, Band and FMH squandered the money and refuse to compensate Plaintiff for its use.

52. Despite Plaintiff's frequent and repeated requests for the return of his money, or even for the payment of token installments to show good faith, Band and FMH have not returned Plaintiff's money to him.

53. As a result of Band and FMH's breach, Plaintiff has been damaged in the amount of $50,000, plus promised returns, plus prejudgment interest, plus consequential and incidental damages to be proven at trial.

## IX. SIXTH CLAIM FOR RELIEF: SECOND MONEY HAD AND RECEIVED AGAINST ALL DEFENDANTS

54. Plaintiff adopts by reference paragraphs 1-53 here.

55. Band and FMH became indebted to Plaintiff for the sum of $200,000 on June 4, 2012, for money lent by Plaintiff to Defendants.

56. Band and FMH did not use Plaintiff's investment for Plaintiff's benefit. Instead of using Plaintiff's loan to generate returns for Plaintiff, Band and FMH squandered the money and refuses to compensate Plaintiff for its use.

57. Despite Plaintiff's frequent and repeated requests for the return of his money, or even for the payment of token installments to show good faith, Band and FMH have not returned Plaintiff's money to him.

58. As a result of Band and FMH's breach, Plaintiff has been damaged in the amount of $200,000, plus promised returns, plus prejudgment interest, plus consequential and incidental damages to be proven at trial.

## X. SEVENTH CLAIM FOR RELIEF: FIRST FRAUD AGAINST ALL DEFENDANTS

59. Plaintiff adopts by reference paragraphs 1-58 here.

60. On November 14, 2011, Band and FMH misrepresented to Plaintiff verbally and in the written contract that if he loaned them $50,000.00, Plaintiff's investment would be guaranteed and would be used to generate returns for Plaintiff. (See Exhibit "1").

61. When Band and FMH made the misrepresentations alleged above, they intentionally and knowingly made them, knew they were false, knew Plaintiff would reasonably and justifiably rely on them, and did so with the purpose of cheating Plaintiff out of $50,000.

Defendants had no intention of returning the funds, and omitted telling this to Plaintiff.

62. When Band and FMH intentionally and knowingly concealed and omitted material facts from Plaintiff as alleged above, they knew that the effect of these omissions would be to make other misrepresentations, which appeared to be true, false statements.

63. Band and FMH made the misrepresentations and omissions knowing and intending that Plaintiff would rely on the misrepresentations and omissions and act on them by loaning $50,000 to Band and FMH.

64. Plaintiff relied on Band and FMH's representations and omissions to his detriment by loaning $50,000 to Band and FMH.

65. Plaintiff's reliance was reasonable since Plaintiff had no indication to believe that he was being defrauded by Band and FMH, and since Band instilled a false sense of security in Plaintiff with their earlier business dealings.

66. As a result of Band and FMH's misrepresentations and omissions, Plaintiff has been damaged in the amount of $50,000, plus promised returns, plus prejudgment interest, plus consequential and incidental damages to be proven at trial.

67. Band and FMH's conduct as alleged in this Complaint was done intentionally, knowingly, and with a willful and conscious disregard for Plaintiff's rights. Band and FMH's trickery was despicable, outrageous, oppressive, malicious, and fraudulent as these terms are defined in Cal. Civ. Code § 3294, so as to warrant the imposition of exemplary and punitive damages to punish and make example of Band.

## XI. EIGHTH CLAIM FOR RELIEF: SECOND FRAUD AGAINST ALL DEFENDANTS

68. Plaintiff adopts by reference paragraphs 1-67 here.

69. On May 3, 2012, Band and FMH misrepresented to Plaintiff verbally and in the written contract, that if Plaintiff loaned them $200,000.00, Plaintiff's investment would be guaranteed and would be used to generate returns for Plaintiff. (See Exhibit "2").

70. When Band and FMH made the misrepresentations alleged above, they intentionally and knowingly made them, knew they were false, knew Plaintiff would reasonably

and justifiably rely on them, and did so with the purpose of cheating Plaintiff out of $200,000. Defendants had no intention of returning Plaintiff's funds, and omitted to tell him this.

71. When Band and FMH intentionally and knowingly concealed and omitted material facts from Plaintiff as alleged above, they knew that the effect of these omissions would be to make other misrepresentations, which appeared to be true, false statements.

72. Band and FMH made the misrepresentations and omissions knowing and intending that Plaintiff would rely on the misrepresentations and omissions and act on them by loaning $200,000 to Band and FMH.

73. Plaintiff relied on Band and FMH's representations and omissions to his detriment by loaning $200,000 to Band.

74. Plaintiff's reliance was reasonable since Plaintiff had no indication to believe that he was being defrauded by Band and FMH, and since Band instilled a false sense of security in Plaintiff with their earlier business dealings.

75. As a result of Band and FMH's misrepresentations and omissions, Plaintiff has been damaged in the amount of $200,000, plus promised returns, plus prejudgment interest, plus consequential and incidental damages to be proven at trial.

76. Band and FMH's conduct as alleged in this Complaint was done intentionally, knowingly, and with a willful and conscious disregard for Plaintiff's rights. Band and FMH's trickery was despicable, outrageous, oppressive, malicious, and fraudulent as these terms are defined in Cal. Civ. Code § 3294, so as to warrant the imposition of exemplary and punitive damages to punish and make example of Band.

## XII. NINTH CLAIM FOR RELIEF: FIRST CONVERSION AGAINST ALL DEFENDANTS

77. Plaintiff adopts by reference paragraphs 1-76 here.

78. Plaintiff has the right to possession and use of his $50,000, and to its immediate return.

79. Band and FMH wrongfully denied Plaintiff the right to possess or use his $50,000, and have refused to return it after Plaintiff's demands for its return.

80. Band and FMH's refusal to return Plaintiff's $50,000 was and is a substantial factor in causing Plaintiff's harm.

81. Plaintiff has been damaged in the amount of to be proven at trial but exceeding $50,000 as a result of Band and FMH's conversion of this money for their own use and their failure to return it. Plaintiff seeks the return of his money, plus promised returns, plus prejudgment interest, plus all consequential and incidental damages resulting from Band's conversion in an amount to be proved at time of trial.

82. Band and FMH intentionally converted Plaintiff's $50,000 to their own use. Their actions were done with malice, fraud, and oppression as those terms are defined in Cal. Civ. Code § 3294 so as to entitle Plaintiff to punitive damages against Band and FMH to punish and make example of them.

## XIII. TENTH CLAIM FOR RELIEF: SECOND CONVERSION AGAINST ALL DEFENDANTS

83. Plaintiff adopts by reference paragraphs 1-82 here.

84. Plaintiff has the right to possession and use of his $200,000, and to its immediate return.

85. Band and FMH wrongfully denied Plaintiff the right to possess or use his $200,000, and have refused to return it after Plaintiff's demands for its return.

86. Band and FMH's refusal to return Plaintiff's $200,000 was and is a substantial factor in causing Plaintiff's harm.

87. Plaintiff has been damaged in the amount of to be proven at trial but exceeding $200,000 as a result of Band and FMH's conversion of this money for their own use and their failure to return it. Plaintiff seeks the return of his money, plus promised returns, plus prejudgment interest, plus all consequential and incidental damages resulting from Band and FMH's conversion in an amount to be proved at time of trial.

88. Band and FMH intentionally converted Plaintiff's $200,000 to their own use. Their actions were done with malice, fraud, and oppression as those terms are defined in Cal. Civ. Code § 3294 so as to entitle Plaintiff to punitive damages against Band and FMH to punish and make

example of them.

## XIV. ELEVENTH CLAIM FOR RELIEF: FIRST FRAUDULENT CONVEYANCE AGAINST ALL DEFENDANTS

89. Plaintiff adopts by reference paragraphs 1-88 here.

90. The $50,000 Plaintiff was defrauded out of was loaned to FMH. Accordingly, Plaintiff is a creditor of FMH as defined under Cal. Civ. Code § 3439, *et seq.*, in that Plaintiff has a claim against FMH for the return of his $50,000.

91. FMH transferred $50,000 of Plaintiff's money to Band and Does 1-20.

92. FMH transferred this money to Band and Does 1-20 with the intent of defrauding, hindering, delaying, or preventing Plaintiff from being able to have his $50,000 or any portion of it returned to Plaintiff in satisfaction of Plaintiff's claims against FMH.

93. These transfers were made without adequate consideration being exchanged and lacked legitimate business purpose.

94. The transfers took place at a time when FMH was engaged, or was about to be engaged, in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction, and at a time wherein FMH intended to incur, or believed or reasonable should have believed that he would incur, debts beyond his ability to pay as they became due.

95. Defendants, including Does 1-20, inclusive, intended to hinder, delay, or defraud Plaintiff from obtaining the return of Plaintiff's $50,000, aided and abetted each other in the commission of such hindering, delaying, or defrauding of Plaintiff, or otherwise willfully and knowingly participated and assisted in the fraudulent transfers.

96. As a direct and proximate result of FMH's fraudulent conveyances, Plaintiff has sustained damages of $50,000, plus promised returns, plus prejudgment interest and other damages to be proven at trial.

97. Under Cal. Civ. Code § 3439.07, Plaintiff requests the prejudgment remedy of attachment to recover his money, and subject to equitable principles, an injunction prohibiting Defendants from further dispersion of Plaintiff's $50,000 and its proceeds, the appointment of a

receiver, at Defendants' expense, to take charge of the $50,000, and any other relief the circumstances may require in the District Court's discretion.

98. Further, FMH's intentional and knowing participation in the fraudulent transfers was malicious, fraudulent, and oppressive as these terms are defined in Cal. Civ. Code § 3294 so as to warrant the imposition of punitive damages against FMH in an amount sufficient to punish and make an example of FMH.

**XV. TWELFTH CLAIM FOR RELIEF: SECOND FRAUDULENT CONVEYANCE AGAINST ALL DEFENDANTS**

99. Plaintiff adopts by reference paragraphs 1-98 here.

100. The $200,000 Plaintiff was defrauded out of was loaned to FMH. Accordingly, Plaintiff is a creditor of FMH as defined under Cal. Civ. Code § 3439, *et seq.*, in that Plaintiff has a claim against FMH for the return of his $200,000.

101. FMH transferred $200,000 of Plaintiff's money to Band and Does 1-20.

102. FMH transferred this money to Band and Does 1-20 with the intent of defrauding, hindering, delaying, or preventing Plaintiff from being able to have his $200,000 or any portion of it returned to Plaintiff in satisfaction of Plaintiff's claims against FMH.

103. These transfers were made without adequate consideration being exchanged and lacked legitimate business purpose.

104. The transfers took place at a time when FMH was engaged, or was about to be engaged, in a business or transaction for which his remaining assets were unreasonably small in relation to the business or transaction, and at a time wherein FMH intended to incur, or believed or reasonable should have believed that he would incur, debts beyond his ability to pay as they became due.

105. Defendants, including Does 1-20, inclusive, intended to hinder, delay, or defraud Plaintiff from obtaining the return of Plaintiff's $200,000, aided and abetted each other in the commission of such hindering, delaying, or defrauding of Plaintiff, or otherwise willfully and knowingly participated and assisted in the fraudulent transfers.

106. As a direct and proximate result of FMH's fraudulent conveyances, Plaintiff has

sustained damages of $200,000, plus promised returns, plus prejudgment interest and other damages to be proven at trial.

107. Under Cal. Civ. Code § 3439.07, Plaintiff requests the prejudgment remedy of attachment to recover his money, and subject to equitable principles, an injunction prohibiting Defendants from further dispersion of Plaintiff's $200,000 and its proceeds, the appointment of a receiver, at Defendants' expense, to take charge of the $200,000, and any other relief the circumstances may require in the District Court's discretion.

108. Further, FMH's intentional and knowing participation in the fraudulent transfers was malicious, fraudulent, and oppressive as these terms are defined in Cal. Civ. Code § 3294 so as to warrant the imposition of punitive damages against FMH in an amount sufficient to punish and make an example of FMH.

## XVI. PLAINTIFF DEMANDS TRIAL BY JURY

Plaintiff demands trial by jury on all claims so triable.

## XVII. REQUEST FOR RELIEF

Plaintiff requests judgment be entered against Band, FMH, and Does 1-20, jointly and severally, as follows:

1. For an award of compensatory and recessionary damages in an amount to be proven at trial, but believed to be no less than $250,000, including any damages as may be provided by statute;

2. For prejudgment interest at the applicable legal rate, in an amount to be proven at trial;

3. For an award of costs and expenses;

4. For equitable and injunctive relief as permitted at law or in equity, including disgorgement, imposing a constructive trust, impounding or attaching Defendants' assets, enjoining Defendants from dissipating or otherwise further transferring the $250,000 or proceeds from it, and requiring Defendants to pay restitution to restore the $250,000 (with interest) that Defendants acquired by means of acts or practices that violated California law or that this Court find to be unlawful, fraudulent, deceptive, or otherwise to be an unfair or unlawful business act or practice;

5. For punitive damages under California Civil Code section 3294 in sufficient amount to punish and deter Defendants' wrongful conduct; and

6. For such other and further relief as this Court may deem just and proper.

Dated: November 11, 2014 BOYD LAW, APC

By: ______________________

Karie J. Boyd
Thomas D. Georgianna
Attorneys for Plaintiff,
**JOHN HACKERT**

**EXHIBIT "1"**

# INVESTMENT AGREEMENT

## *"ZOMBIES VS. STRIPPERS"*

Dated: As of November 14 , 2011

**This Investment Agreement** (this "**Agreement**") is entered into by and between **FULL MOON HOLDINGS, INC.** (the "**Company**") and **JOHN HACKERT** ("**John**") in connection with the feature length motion picture to be produced from the screenplay currently entitled *Zombies vs. Strippers* (the "**Picture**"). For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Investment**. John shall contribute the sum of Fifty Thousand Dollars ($50,000) (the "**Investment Amount**") for use by the Company in connection with the production, post-production, sales, marketing and distribution of the Picture. The Investment Amount shall be paid to the Company by John as follows:

(a) $25,000 shall be contributed on or before November 14, 2011; and

(b) the remaining $25,000 shall be contributed on or before December 17, 2011.

The Company shall be entitled to utilize the Investment Amount as it is contributed to the Company.

2. **Production**. The Company agrees that it shall develop, produce and complete the Picture substantially in accordance with the approved Budget no later than March 31st, 2012 2012 (the "**Delivery Date**").

3. **Return on Investment**. As consideration for the contribution of the Investment Amount, John shall be entitled to receive the following:

(a) Fifty percent (50%) of Net Revenues received by the Company from the exploitation of the Picture, until such time as John has received the return of the entire amount of the Investment Amount.

(b) Thereafter, thirty percent (30%) of all Net Revenues received by the Company from the exploitation of the Picture for a period of ten (10) years commencing on the date of first public exhibition of the Picture (the "**Term**").

(c) For purposes hereof, "Net Revenues" shall mean all amounts actually received by the Company from the exploitation of the Picture, less returns and credits, and less costs of exhibition, distribution, sales, prints and advertising. Notwithstanding the foregoing, it is agreed that the Company shall not charge any distribution or sales fees in connection with the exploitation of the Picture.

(f) John has adequate means of providing for his current financial needs and contingencies, is able to bear the substantial economic risks of this investment for an indefinite period of time, has no need for liquidity in this investment, and, at the present time, could afford a complete loss of this investment.

(g) John has such knowledge and experience in financial, tax and business matters so as to enable him to evaluate the merits and risks of this investment and to make an informed investment decision with respect thereto.

7. **Indemnification by the Company**. The Company shall indemnify, save and hold harmless John from and against any claims, demands, causes of action, obligations, liability, loss, damage, cost and expenses (including reasonable attorneys' fees), incurred or sustained by reason of or arising out of or in connection with the development, production and/or exploitation of the Picture.

8. **Miscellaneous**.

(a) This Agreement may not be modified except by written agreement signed by each of the parties hereto.

(b) No waiver by one party of a breach or default by the other party shall be deemed to be a waiver of any preceding, continuing or succeeding breach of the same or any other provision of this Agreement.

(c) This Agreement has been entered into in the State of California and shall be construed and enforced under and subject to the laws of said state.

(d) Should there be any dispute between the parties concerning the interpretation of this Agreement or concerning an alleged breach of this Agreement, which the parties are unable to resolve after consultation with each other, such dispute shall be decided by arbitration pursuant to the regulations and procedures of the American Arbitration Association. The parties agree that any award rendered by the American Arbitration Association may be entered in the appropriate state or federal court located within the state of California.

9. **Notices**. All notices shall be in writing and shall be sent to the parties at the following addresses:

If to the Company:

Full Moon Holdings, Inc.
c/o Charlie Band
1626 N. Wilcox Ave., Suite 474
Hollywood, CA 90028

If to John:

John Hackert
345 Mariaville Road
Schenectady, NY 12306

4. **Accounting and Audits**. Within forty-five (45) days following the end of each calendar quarter during the first two (2) years of the Term, and within forty-five (45) days following the end of each year during the remainder of the Term, Company shall provide John with a written statement of all Net Revenues earned by the Company during such period, together with a check for any amounts owed to John in connection therewith. Not more than once during any twelve (12) month period, a certified public accountant on John's behalf and at John's expense may audit Company's books and records in respect to Net Revenues for the purpose of determining the accuracy of the statements rendered by Company hereunder. All such audits shall be made during regular business hours upon not less than thirty (30) days' prior written notice to Company, and shall occur at Company's regular place of business where such books and records are maintained. Company's books and records may be examined as aforesaid only within one (1) year after the date rendered, and Company shall not have any obligation to permit John to examine Company's books and records relating to any particular accounting period more than once. The rights granted in this paragraph shall constitute John's sole and exclusive right to examine Company's books and records.

5. **Credits**. John shall be entitled to receive an on-screen credit as a Co-Producer of the Picture, with the size, position and other aspects of such credit to be determined by the Company. John shall also be entitled to appear in a cameo role in the Picture, to be determined by the Company, and shall receive on-screen credit in connection therewith.

6. **Representations and Warranties**. John hereby represents, warrants and covenants to the Company that:

(a) John is has the power and all necessary rights and resources to enter into and perform this Agreement and the transactions contemplated herein.

(b) This Agreement constitutes John's legal, valid and binding obligation.

(c) The entry into and performance of this Agreement and the transactions contemplated thereby do not and will not conflict with: (i) any existing law or regulation or any official or judicial order, or (ii) any agreement or document to which John is a party or which is binding upon him or any of his assets.

(d) The Company has not made any oral or written representations other than those stated in this Agreement.

(e) John is not contributing the Investment Amount as result of or subsequent to any advertisement, article, notice, other communication published in any newspaper, magazine, or similar media or broadcast over television or radio or the Internet, or presented at any seminar or meeting, or any solicitation by a person other than a representative of the Company.

**10. Counterparts.** This Agreement may be executed in counterparts. For purposes of this Agreement, facsimile signatures or signatures sent by email in a pdf format shall be treated as original signatures.

WHEREFORE, the parties have executed this Agreement on the date first above written.

"John"

John Hackert

("the Company")

Full Moon Holdings, Inc.

By: ____________________
Charles Band, President

**Regarding the financing agreement for ZOMBIES VS STRIPPERS**
**Personal Guarantee of Charles Band**

$50,000.00

Nov 14th, 2011
Los Angeles, California

Dear John Hackert,
This letter will confirm that if you have not received your full investment back within 12 calendar months from the date of your second payment of $25,000 (for a total investment of $50,000) that I will personally pay to you whatever shortfall may occur. For clarity, if you have only collected a total of $40,000 12 months after your investment, then I will pay to you the difference of $10,000.

Please confirm that this reflects your understanding by signing below.

Very best,
CB

Executed at Los Angeles, California.

X ______________________
Full Moon Holdings, Inc.
Charles Band President

X ______________________
Charles Band

Agreed and accepted

______________________
John Hackert

**EXHIBIT "2"**

# INVESTMENT AGREEMENT

***"Puppet Master 10: Axis Rising"***

Dated: As of May _3rd__, 2012

**This Investment Agreement** (this "**Agreement**") is entered into by and between **FULL MOON HOLDINGS, INC.** (the "**Company**") and **JOHN HACKERT** ("**John**") in connection with the feature length motion picture to be produced from the screenplay currently entitled *Puppet Master 10: Axis Rising* (the "**Picture**"). For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Investment**. John shall contribute the sum of Two Hundred Thousand Dollars ($200,000) (the "**Investment Amount**") for use by the Company in connection with the production, post-production, sales, marketing and distribution of the Picture. The Investment Amount shall be paid to the Company by John as follows:

(a) $100,000 shall be contributed on or before May 14, 2012; and

(b) the remaining $100,000 shall be contributed on or before June 4, 2012.

The Company shall be entitled to utilize the Investment Amount as it is contributed to the Company.

2. **Production**. The Company agrees that it shall develop, produce and complete the Picture substantially in accordance with the approved Budget no later than ____September_______, 2012 (the "**Delivery Date**").

3. **Return on Investment**. As consideration for the contribution of the Investment Amount, John shall be entitled to receive the following:

(a) Fifty percent (50%) of Net Revenues received by the Company from the exploitation of the Picture, until such time as John has received the return of the entire amount of the Investment Amount.

(b) Thereafter, fifty percent (50%) of all Net Revenues received by the Company from the exploitation of the Picture for a period of ten (10) years commencing on the date of first public exhibition of the Picture (the "**Term**").

(c) For purposes hereof, "Net Revenues" shall mean all amounts actually received by the Company from the exploitation of the Picture, less returns and credits, and less costs of exhibition, distribution, sales, prints and advertising. Notwithstanding the foregoing, it is agreed that the Company shall not charge any distribution or sales fees in connection with the exploitation of the Picture.

**4. Accounting and Audits.** Within forty-five (45) days following the end of each calendar quarter during the first two (2) years of the Term, and within forty-five (45) days following the end of each year during the remainder of the Term, Company shall provide John with a written statement of all Net Revenues earned by the Company during such period, together with a check for any amounts owed to John in connection therewith. Not more than once during any twelve (12) month period, a certified public accountant on John's behalf and at John's expense may audit Company's books and records in respect to Net Revenues for the purpose of determining the accuracy of the statements rendered by Company hereunder. All such audits shall be made during regular business hours upon not less than thirty (30) days' prior written notice to Company, and shall occur at Company's regular place of business where such books and records are maintained. Company's books and records may be examined as aforesaid only within one (1) year after the date rendered, and Company shall not have any obligation to permit John to examine Company's books and records relating to any particular accounting period more than once. The rights granted in this paragraph shall constitute John's sole and exclusive right to examine Company's books and records.

**5. Credits.** John shall be entitled to receive an on-screen credit as a Co-Producer of the Picture, with the size, position and other aspects of such credit to be determined by the Company. John shall also be entitled to appear in a cameo role in the Picture, to be determined by the Company, and shall receive on-screen credit in connection therewith.

**6. Representations and Warranties.** John hereby represents, warrants and covenants to the Company that:

(a) John is has the power and all necessary rights and resources to enter into and perform this Agreement and the transactions contemplated herein.

(b) This Agreement constitutes John's legal, valid and binding obligation.

(c) The entry into and performance of this Agreement and the transactions contemplated thereby do not and will not conflict with: (i) any existing law or regulation or any official or judicial order, or (ii) any agreement or document to which John is a party or which is binding upon him or any of his assets.

(d) The Company has not made any oral or written representations other than those stated in this Agreement.

(e) John is not contributing the Investment Amount as result of or subsequent to any advertisement, article, notice, other communication published in any newspaper, magazine, or similar media or broadcast over television or radio or the Internet, or presented at any seminar or meeting, or any solicitation by a person other than a representative of the Company.

(f) John has adequate means of providing for his current financial needs and contingencies, is able to bear the substantial economic risks of this investment for an

indefinite period of time, has no need for liquidity in this investment, and, at the present time, could afford a complete loss of this investment.

(g) John has such knowledge and experience in financial, tax and business matters so as to enable him to evaluate the merits and risks of this investment and to make an informed investment decision with respect thereto.

7. **Indemnification by the Company**. The Company shall indemnify, save and hold harmless John from and against any claims, demands, causes of action, obligations, liability, loss, damage, cost and expenses (including reasonable attorneys' fees), incurred or sustained by reason of or arising out of or in connection with the development, production and/or exploitation of the Picture.

8. **Miscellaneous**.

(a) This Agreement may not be modified except by written agreement signed by each of the parties hereto.

(b) No waiver by one party of a breach or default by the other party shall be deemed to be a waiver of any preceding, continuing or succeeding breach of the same or any other provision of this Agreement.

(c) This Agreement has been entered into in the State of California and shall be construed and enforced under and subject to the laws of said state.

(d) Should there be any dispute between the parties concerning the interpretation of this Agreement or concerning an alleged breach of this Agreement, which the parties are unable to resolve after consultation with each other, such dispute shall be decided by arbitration pursuant to the regulations and procedures of the American Arbitration Association. The parties agree that any award rendered by the American Arbitration Association may be entered in the appropriate state or federal court located within the state of California.

9. **Notices**. All notices shall be in writing and shall be sent to the parties at the following addresses:

If to the Company:

Full Moon Holdings, Inc.
c/o Charlie Band
1626 N. Wilcox Ave., Suite 474
Hollywood, CA 90028

If to John:

John Hackert
345 Mariaville Road
Schenectady, NY 12306

**10. Counterparts**. This Agreement may be executed in counterparts. For purposes of this Agreement, facsimile signatures or signatures sent by email in a pdf format shall be treated as original signatures.

WHEREFORE, the parties have executed this Agreement on the date first above written.

"John"

John Hackert 5-7-2012

("the Company")

Full Moon Holdings, Inc.

By: ______________________
Charles Band, President



842491.1

**Regarding the financing agreement for Puppet Master 10: Axis Rising**
**Personal Guarantee of Charles Band**

$200,000.00

May 3rd, 2011
Los Angeles, California

Dear John Hackert,
This letter will confirm that if you have not received your full investment back within 18 calendar months from the date of your second payment of $100,000 (for a total investment of $200,000) that I will personally pay to you whatever shortfall may occur. For clarity, if you have only collected a total of $160,000 within 18 months after your investment, then I will pay to you the difference of $40,000.

Please confirm that this reflects your understanding by signing below.

Very best,
CB

Executed at Los Angeles, California.

X ______________________
Full Moon Holdings, Inc.
Charles Band President

X ______________________
Charles Band

Agreed and accepted
______________________
John Hackert